# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| CHRISTINA RODRIGUEZ-DENSLEY and WILLIE DENSLEY,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>*Defendant*. | CIVIL ACTION NO.<br>5:17-cv-00026-TES |

## BENCH TRIAL VERDICT

Plaintiffs Christina Rodriguez-Densley ("Ms. Densley") and Willie Densley ("Mr. Densley") filed this action against the United States of America ("Defendant") following their submission of an administrative claim to the United States Postal Service. [Docs. 1 at ¶ 3, 55 at p. 11]. When an agency, such as the United States Postal Service, fails to make a final disposition of an administrative claim within six months, federal law[1] permits the claimant to "any time thereafter" consider that failure "a final denial of the claim." 28 U.S.C. § 2675(a). Plaintiffs' administrative claim arose out of a motor vehicle collision that

---

[1] "An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section." 28 U.S.C. § 2675(a).

occurred on February 3, 2015, between a vehicle driven by Ms. Densley and another vehicle driven by Joseph Phillips ("Mr. Phillips"), an employee of the United States Postal Service. [Docs. 1 at ¶ 6, 8 at ¶ 6].

Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) in connection with 28 U.S.C. § 2671 ("FTCA"), this case came before the Court for a bench trial on October 22-23, 2018. [Doc. 42]. Accordingly, the Court is obligated to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). After considering the evidence and applicable law, the Court makes the following Findings of Fact and Conclusions of Law, and as explained herein, **GRANTS** judgment in favor of **PLAINTIFFS** and against **DEFENDANT** on all claims.

## BURDEN OF PROOF

"Liability in an FTCA action is determined in accordance with the law of the place where the government's act or omission occurred, which in this case is" Georgia. *Stevens v. Battelle Mem'l Inst.*, 488 F.3d 896, 899 n.3 (11th Cir. 2007). Under Georgia law, it is Ms. and Mr. Densley's responsibility, as the plaintiffs, to prove every essential part of their claims by a preponderance of the evidence.[2] Ga. Code Ann. § 24-4-3. *See also Zwiren v. Thompson*, 578 S.E.2d 862, 864 (Ga. 2003); 3.7.1 Responsibility for Proof; Pattern Jury

---

[2] Georgia law statutorily defines "preponderance of the evidence" as "that superior weight of evidence upon the issues involved, which, while not enough to free the mind wholly from a reasonable doubt, is yet sufficient to incline a reasonable and impartial mind to one side of the issue rather than to the other." Ga. Code Ann. § 24-1-1(5).

2

Instructions, Civil Cases, Eleventh Circuit (2013 revision). Or, stated differently, it is their responsibility to set forth an amount of evidence that is enough to persuade the finder of fact that their claims are more likely true than not. 3.7.1 Responsibility for Proof; Pattern Jury Instructions, Civil Cases, Eleventh Circuit (2013 revision). If the proof fails to establish any essential part of a claim or contention by a preponderance of the evidence the finder of fact should find against the party making that claim or contention. *Id.* In deciding whether any fact has been proved by a preponderance of the evidence, the finder of fact may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them. *Id.* If the proof fails to establish any essential part of Ms. or Mr. Densley's claims by a preponderance of the evidence, the finder of fact should find for the Defendant as to that claim. *Id.* With this burden of proof in mind, the Court makes the following Findings of Fact and Conclusions of Law.

## **FINDINGS OF FACT**[3]

The evidence presented at trial shows that this case arises out of a motor vehicle collision that occurred on February 3, 2015. [Doc. 49 at 47:21–23]; *see also* [Doc. 46–28]. Ms. Densley was returning home after receiving a call from her children's school. [Doc. 50 at

---

[3] To the extent that any of the Court's factual findings may be considered conclusions of law or vice versa, they are to be considered as such. *See* Wright & Miller, *Federal Practice & Procedure*: Civil 3d § 2579, at 325 n.2 (2008) citing *Imprimis Int'l, Inc. v. Fraidenburgh*, No. CIV. S-04-1297 FCD DAD, 2007 WL 1576356, at *1, n.2 (E.D. Cal. May 31, 2007).

13:23, 21:5–6]. Unbeknownst to Ms. Densley, at the time, Mr. Phillips, a seasoned full-time carrier for the United States Postal Service with an award for driving over one million miles, entered the first driveway of a U-shaped residential driveway (the "Rickerson Driveway") to deliver mail[4] and attempted to exit from its second driveway. [*Id.* at 126:24—127:9, 132:25, 133:20–21]; *see also* [Docs. 46-2; 46-9].

Before exiting the Rickerson Driveway, Mr. Phillips "looked left, looked right, and looked back left," and proceeded to make a left-hand turn onto Highway 57 at which point Ms. Densley's vehicle was "already up on him." [Doc. 50 at 128:4–7, 132:25—133:2]. As Ms. Densley simultaneously approached the Rickerson Driveway, she noticed that Mr. Phillips "had been sitting [at the end of the driveway] for some time" and thought that he was going to remain in the driveway until she passed. [*Id.* at 23:14–17]. However, as Ms. Densley proceeded along the roadway, Mr. Phillips pulled out of the Rickerson Driveway "at the last second" onto Highway 57. [*Id.* at 23:18–19]. In an effort to avoid a collision, Ms. Densley "yank[ed] the steering wheel" to the left and "slam[med] on the brake" hoping to swerve around Mr. Phillips' vehicle by using the oncoming lane of traffic. [*Id.* at 23:19–21, 160:25—161:2]; *see also* [Doc. 55 at p.2]. The impact with Mr. Phillips' truck sent Ms. Densley's vehicle down an embankment off her left-hand side of the road where it came to a rest in a wooded area. [Doc. 50 at 24:2–12]. Mr. Phillips

---

[4] To be able to deliver mail in his unmodified pickup truck, Mr. Phillips sat in the middle, drove left-handed, and "us[ed] [his] left foot to maneuver" and operate the vehicle. [Doc. 50 at 137:10-17].

4

testified that when he first "caught a glimpse" of Ms. Densley's vehicle,[5] he did not have enough time to complete his left-hand turn from the Rickerson Driveway because Ms. Densley swerved into his lane—and, as a result, he stopped his vehicle and Ms. Densley collided with him. *See* [*Id.* at 143:16–20, 157:20—158:7].

As a result of the accident, Ms. Densley sustained a "severe injury of her lower leg at the ankle" and continues to suffer from elevated post-traumatic pain. [Doc. 49 at 276:18–19, 396:14—397:2]. When medical personnel "extricated" Ms. Densley from her vehicle, "her left foot was turned inward at a 90-degree angle from her . . . ankle." [Doc. 49 at 276:20—277:9]. Immediately following the accident, Emergency Medical Services transported Ms. Densley to the Medical Center Navicent Health, where she was hospitalized until February 9, 2015. *See* [Doc. 47-17 at MCNH0002].

Before being seen by Dr. Lawrence Webb ("Dr. Webb"), an orthopedic trauma surgeon, Ms. Densley's foot had already been "reduced" or "popped back into somewhat anatomic position" by his physician assistant. [Doc. 49 at 278:5–7]. When Dr. Webb first treated Ms. Densley in the operating room, he performed a debridement to remove the contaminated tissue by "excis[ing] the tissues down to the bone" and "scraping the bone

---

[5] The posted speed limit at the area of impact is 55 miles per hour. [Doc. 50 at 21:11–12]. In order to determine the period of visibility looking from the second drive of the Rickerson Driveway, Officer David Anderson ("Officer Anderson") measured 450 feet from Mr. Phillips' point of exit to the point where vehicles traveling west became visible. [Doc. 49 at 57:3–7]; *see also* [Doc. 46-7]. Using 450 feet as the distance variable and the posted speed limit, Officer Anderson determined that a vehicle traveling 55 miles per hour is covering 80 feet per second and is visible for five to six seconds from its first point of visibility until it reaches the driveway. [Doc. 49 at 55:18—56:22].

5

ends" with an "inflow of sterile saline solution." [*Id.* at 279:15—280:10]. After this first treatment to Ms. Densley's ankle, Dr. Webb positioned the bone back in place "and held it there with an internal fixator, which is a frame where pins are delivered through the bone." [*Id.* at 280:11–15]. "A couple of days later," after having monitored the wound and fracture for infection, Dr. Webb found the wound to be clean and removed the frame on February 5, 2015. [*Id.* at 281:23–25].

From there, he proceeded with "fixing the . . . pilon fracture" which "was essentially a shear injury on the plafond, [or] the weight-bearing area of the ankle" by using plates and a "screw-and-pin fixation" to hold and stabilize the plates in position to fix the fractured joints in Ms. Densley's ankle. [*Id.* at 282:1–10, 286:2—289:7]. On February 9, 2015, the hospital discharged Ms. Densley with instructions that she be "non-weightbearing," meaning she could not put any weight "at all" on her injured leg, for three months. [*Id.* at 289:13–20]. During her follow-up visits, Dr. Webb noted that "[Ms. Densley] would come in one visit and . . . be reasonable with regard to how she was doing, and then she would come in . . . the next visit and be in a lot of pain." [*Id.* at 292:6–9]. In an effort to alleviate some of the "shooting pain that goes up [Ms. Densley's] leg," Dr. Webb planned for her to begin "physical therapy twice weekly for range of motion in the ankle" and to, at that point, begin partial weightbearing exercises. [*Id.* at 293:10—294:20]; *see also* [Doc. 47-18 at GOTI 0040].

Seven months from the surgery where he attempted to mend Ms. Densley's tibial plafond fracture, Dr. Webb observed, in spite of his assessment that the "wounds [were] well healed," that she "ha[d] pain with weightbearing," which may have been caused by the retained hardware. [Doc. 49 at 295:2–25]; *see also* [Doc. 47-18 at GOTI0046]. To support his diagnoses, Dr. Webb testified that her "X-rays ha[d] findings consistent with a fibrous union of the very distal most aspect of her fibula and a retained hardware." [Doc. 47-18 at GOTI0046]. At that point, Dr. Webb became concerned that a fibrous union had developed in just seven months after the installation of the prominent hardware and was causing Ms. Densley discomfort and pain. [Doc. 49 at 295:21–22]. In a further effort to decrease her pain, Dr. Webb performed another operation on September 24, 2015, and removed the bottom portion of the previously installed hardware. [*Id.* at 296:1–6].

After three follow-up visits, X-rays showed findings consistent with post-traumatic arthritis and Dr. Webb recommended a tibiotalar-calcaneal fusion ("TTC") as a means to "salvage a very arthritic ankle in somebody who is young and has had trauma." [*Id.* at 297:7—299:25]; *see also* [Doc. 47-18 at GOTI0051, GOTI0053, GOTI0055, GOTI0057]. Dr. Webb opined that Ms. Densley's arthritis was the aftermath of "a bad trauma," and was the cause of her ankle canting. [Doc. 49 at 299:8–20]. Following the TTC surgery,[6] Ms. Densley had to remain non-weightbearing again for a "two or three month[]" period. [*Id.* at 303:15–22]. However, because a solid ankle fusion had not

---

[6] The date of the TTC surgery was February 12, 2016. [Doc. 49 at 297:7–18]; *see also* [Doc. 47-18 at GOTI0057].

occurred within that time, Dr. Webb performed another surgery on January 13, 2017, to excise the bone fragment that was the source of Ms. Densley's discomfort and pain. [*Id.* at 304:3–13]; *see also* [Doc. 47-18 at GOTI0109].

Almost four months after this latest surgery, and some two years and three months since Dr. Webb performed the TTC, a CT scan revealed "a scant amount of bone-on-bone healing" and a lack of a solid fusion. [Doc. 49 at 306:5—309:5]. Because the ankle joint had not fused in over two years following the TTC, Dr. Webb presented the option of another surgery to address pain management. [*Id.* at 310:5–18]; *see also* [Doc. 47-18 at GOTI0139]. If Ms. Densley decided to take this route, this next surgery would involve "scraping the cartilage to simulate direct bone formation at the level of the subtalar and ankle joints." [Doc. 47-18 at GOTI0139]. However, the medical records state that Ms. Densley "would prefer to hold off on any further surgery—unless her situation worsens." [*Id.*]. While Dr. Webb assured Ms. Densley that her decision to forego any further surgery at this point "is reasonable," he also believes "there is a likelihood" that she will need additional surgery[7] in order to expect any improvement. [*Id.*]; *see also* [Doc. 49:314:8—315:13].

The underlying complications as to why Ms. Densley's ankle has yet to successfully fuse were best explained by Dr. Wood Pope ("Dr. Pope"). [Doc. 49 at

---

[7] Dr. Webb testified that a reasonable way to gauge the cost of this potential next surgery would be to look at the cost of the TTC performed on February 12, 2016. [Doc. 49 at 316:9–16]. The jointly-admitted medical expense records show that the cost of the TTC was approximately $45,000.00. [Doc. 47-28 at BILLS025, BILLS057, BILLS077].

8

366:16—368:23]. In short, "when a bone is displaced that far out of its normal bed, it gets stripped of all its microscopic vasculature." [*Id.* at 367:16–18]. And, even though the bone may be put back into place and there is tissue around it, the "disruption of even the microscopic vasculature that supplies the bone is what makes it devoid of a vascular supply" because the microscopic vessels "thrombose off" and cannot "reattach to the bone and supply [blood to it]." [*Id.* at 367:19—368:11].

Furthermore, Dr. Pope explained that as time progresses, the likelihood that a future surgery will result in a successful fusion diminishes, and confirmed that there is no guarantee that a subsequent revision fusion surgery will work. [*Id.* at 381:9—382:11]. Dr. Pope testified that "[Ms. Densley] certainly has failed to fuse her fracture; and then she failed to fuse her primary fusion, which is not a good predictor for success with another surgery." [*Id.* at 382:11–14]. If further attempts to fuse the ankle fail, Dr. Pope suggested that Ms. Densley amputate her lower leg given that it is a more predictable surgery, and might offer a better outcome for her in terms of pain and function. [*Id.* at 383:1–22]. But of course, a surgery like a below-the-knee amputation is a drastic choice, and Ms. Densley, as the patient, would have to make the decision to part with her foot and ankle. [*Id.*].

Despite Ms. Densley's impairment, several excerpts from the testimony given at trial show her ability to work from a seated position. *See, e.g.*, [Doc. 49 at 353:8–15, 214:14—215:15, 261:7–19]; *see also* [Doc. 49 at 215:3–4]. While there are certainly limitations

9

as to the types of job duties Ms. Densley can perform, her primary care doctor, Dr. Shelley Street Callender, did not give Ms. Densley any restriction of her upper extremity and testified that her ability to write and use her hands was not affected by the accident. [Doc. 49 at 261:19, 215:13–14]. Notwithstanding her ability to use her upper extremity, Ms. Densley has not worked or sought employment for six years. [Doc. 50 at 66:18–22]. In fact, Ms. Densley's last employment prior to the accident was at a CVS where she made "roughly $9 an hour." [*Id.* at 62:13–23]. However, she was terminated from that job[8] after a dispute with a co-worker. [*Id.* at 65:24—66:4]. Ms. Densley stopped working in 2011. [*Id.* at 9:9].

Aside from causing restraints on her ability to work, this accident has brought profound impacts on Ms. Densley's day-to-day life as a wife and mother. Mr. Densley's adjustment to his work schedule and increase in household chores and upkeep has created a sense of worry in Ms. Densley because of her inability to perform household tasks in the same manner she did before the accident. [Doc. 49 at 107:25, 110:114–25, 135:8–10]. Finally, Ms. Densley testified that she has not been pain free since the date of the accident. [Doc. 50 at 45:21–22]. Although her pain is not always severe, her everyday pain led to the frequent office visits and intense surgeries discussed above. In total, Ms.

---

[8] The hourly rate earned during her employment at CVS is the basis of her lost wages claim, "about $9 an hour." [Doc. 50 at 66:2–5].

Densley's past medical bills from February 3, 2015 to October 3, 2018, amount to $248,720.29. [Doc. 47-28 at BILLS001-BILLS004].

At the time Plaintiffs filed their Federal Tort Claims Act Standard Form 95, they sought personal injury damages in the amount of $2,850,000.00 for Ms. Densley and $500,000.00 for Mr. Densley. [Docs. 47-1, 47-2].

## CONCLUSIONS OF LAW

### A. The Car Accident on February 3, 2015

Plaintiffs filed this lawsuit alleging that Mr. Phillips committed negligence per se in violation of Ga. Code Ann. § 40-6-73 by failing to yield the right of way to Ms. Densley's vehicle as he was entering Highway 57 from the Rickerson Driveway. [Doc. 1 at ¶ 12]. Georgia law provides that "[t]he driver of a vehicle about to enter or cross a roadway from any place other than another roadway shall yield the right of way to all vehicles approaching on the roadway to be entered or crossed." Ga. Code. Ann. § 40-6-73. In following with the burden of proof established above and the well-known principles of negligence per se under Georgia law, Plaintiffs must prove that Mr. Phillips is more responsible[9] for the car accident that occurred on February 3, 2015.

Defendant contends that Ms. Densley's last-minute decision to swerve left in an effort to avoid the collision was negligent and a contributing cause of the accident in this

---

[9] Under Georgia law, a "plaintiff shall not be entitled to receive any damages if the plaintiff is 50 percent or more responsible for the injury or damages claimed." Ga. Code Ann. § 51-12-33(g).

11

case. However, for the reasons that follow, the Court finds as a matter of law that Mr. Phillips' failure to yield the right of way to Ms. Densley created a sudden emergency to which Ms. Densley reacted reasonably.

"The doctrine of emergency refers only to those acts, either of the plaintiff or the defendant, which occur immediately following the realization of the peril or crisis and before there is time for mature reflection." [Doc. 55 (citing *Ware v. Alston*, 145 S.E.2d 721, 723 (Ga. Ct. App. 1965)]. Furthermore,

> [i]n an action for negligence, it is necessary, in order to render the emergency doctrine applicable, that the one confronted with a sudden emergency have available to h[er] a choice of alternative courses of action by which to meet the emergency plus sufficient time and opportunity to take some action to avoid the injury.

*Ware*, 145 S.E.2d at 722. However, the doctrine's applicability is not without limitation. "The fact that a person is confronted with an emergency does not relieve [her] from a duty to exercise ordinary care." *Id.* at 723. Where emergency situations are likely to impair the person's judgment, such a factor is to be considered by the factfinder in determining what constituted ordinary care under the circumstances of the specific case. *Id.*

The Court as the finder of fact is tasked with the unique obligation to weigh the evidence presented to it during the bench trial and to weigh the credibility of the witnesses and their respective testimony. Having carefully considered each witness' testimony and its contribution to the overarching facts of the case, the Court finds, notwithstanding Mr. Phillips' testimony, that his actions placed Ms. Densley in a sudden

emergency when he (despite her visibility for five to six seconds) pulled out of the Rickerson Driveway into her lane of travel. Having no time for "mature reflection," the Court further concludes that Ms. Densley was not breaking any laws at the time of the accident and exercised ordinary care under the circumstances to diminish any potential harm from the collision—by swerving to the left of Mr. Phillips' vehicle and applying her brakes. Officer Anderson's review of the scene of the collision found that Mr. Phillips failed to yield the right of way to Ms. Densley and the Court concluding the same finds that Mr. Phillips' negligent actions were the sole proximate cause of Plaintiffs' injuries and damages for which the United States of America as his employer is liable. Consequently, the Court finds that Ms. Densley bears no responsibility for the accident.

### B. Damages Sustained by Plaintiffs

To recap, Plaintiffs are seeking past and future medical expenses; lost wages;[10] general damages in the form of past and future pain and suffering; and damages related

---

[10] With specific regard to lost wages, the Court will not award the total amount of damages Plaintiffs sought. On the issue of lost wages and lost future wages, the Court concludes that Plaintiffs' request that the Court "consider anywhere from $7.25 to $9 an hour" for 40 hours per week, with a thirty-year life expectancy (up to age 64) totaling $540,000.00 is not supportable. As the Georgia Court of Appeals has noted in this area, the evidence as to the measure of such damages requires comparing the earnings before and after the injury. *Leggett v. Benton Bros. Drayage & Storage*, 277 S.E.2d 397, 401 (Ga. Ct. App. 1976). Such measure must be reasonably ascertained by the finder of fact and should not be based on conjecture, speculation, or guesswork. *See Mathis v. Copeland*, 228 S.E.2d 23, 23 (Ga. Ct. App. 1976). Even though lost wages may be recovered despite the fact that Ms. Densley was not employed at the time of the injury, *Quicktrip Corp. v. Childs*, 469 S.E.2d 763, 768 (Ga. Ct. App. 1996), the short and sporadic duration of her past employment proves too speculative to warrant an award approaching the amount sought. Ms. Denlsey has not worked since 2011 and has not sought any sort of employment since the accident, notwithstanding the evidence from her doctors that she is able to work in a limited capacity.

to Mr. Densley's loss of consortium claim. As stated above, Plaintiffs' Standard Form 95 sought personal injury damages in the amount of $2,850,000.00 for Ms. Densley and $500,000.00 for Mr. Densley for his loss of consortium. Defendant, on the other hand, claims that the facts of this case "result[] in a finding of no liability[11] for the Defendant" because Ms. Densley was "50 percent or more responsible for the injury or damages claimed." [Doc. 54 at p. 6]; *see also* Ga. Code Ann. § 51-12-33(g).

To reiterate, this accident was not Ms. Densley's fault, and there is no doubt that this accident has brought long-lasting effects to Ms. Densley and her family. Specifically, the Court concludes that the permanency of Ms. Densley's injury, coupled with anxiety and her constant but fluctuating severity of pain, inability to perform daily tasks without assistance, and the bearing of the injury on her involvement with her children ushers in an irreversible impact on the quality of her life. Critically, this accident has left Ms. Densley with the absolutely awful choice of remaining in what will likely be constant pain for the rest of her life or choosing to cut off her leg. If she chooses the former route, she is left with a leg that doesn't really work; should she choose the latter, she won't have a leg at all. Without doubt, Ms. Densley has suffered greatly and will likely continue to do so. Because of these serious and permanent injuries, she is entitled to a significant award of damages.

---

[11] Under Georgia law, this conclusion would mean that Plaintiffs would recover nothing.

Upon careful consideration of the evidence presented at the bench trial, the testimony of the witnesses, an assessment of each witness' credibility, and an independent review of the trial transcript and the parties' admitted trial exhibits, as well as the parties' submission of their proposed finds of fact and conclusions of law, the Court exercises its considerable discretion as the finder of fact and concludes that $1,500,000.00 is an appropriate award to Ms. Densley for the general and special damages that she has suffered in the past and will likely suffer in the future.

The Court concludes that Mr. Densley has been an exceptional husband to Ms. Densley during this terrible ordeal. He has been extraordinarily loving and loyal to her and has taken up a much-increased share of the couple's collective load, without whining or complaint. In short, he has been exactly what we would all expect a husband to be. And, according to the Court, he has done so with a pleasant attitude and a willing servant-like heart.

Georgia law states that "[d]amages for loss of consortium, . . . are . . . not capable of exact pecuniary measure and must be left to the enlightened conscience of [an] impartial [factfinder] taking into consideration the nature of the services, society, and companionship and all the circumstances of the case." *Gurly v. Hinson*, 391 S.E.2d 483, 486 (Ga. Ct. App. 1990). To that end, the Court awards $100,000.00 for Mr. Densley's personal injury (loss of consortium) claim.

## **CONCLUSION**

Given that Mr. Phillips' personal liability insurance company previously paid $100,000.00 in exchange for a limited liability release of any claims against Mr. Phillips, and that the parties stipulated to the same, Defendant is entitled to a setoff in the amount of $100,000.00 from any judgment entered herein. *See* [Doc. 20-2].

Based on the foregoing Findings of Fact and Conclusions of Law, the Court hereby **ORDERS** the Clerk to enter **JUDGMENT** in favor of **PLAINTIFFS**, Ms. Christina Rodriguez-Densley and Mr. Willie Densley, and against **DEFENDANT**, the United States of America, in the total amount of **$1,500,000.00** to bear interest at the rate provided by law.

Furthermore, in accordance with the FTCA, "[n]o attorney shall charge, demand, receive, or collect for services rendered, fees in excess of 25 per centum of any judgment rendered pursuant to section 1346(b) . . . ." 28 U.S.C. § 2678. The amount of attorneys' fees awarded under the FTCA is deducted from the total judgment awarded. *Douglas v. United States*, No. 8:09-cv-2145-T-33-TBM, 2011 WL 4809224 at *2 (M.D. Fla. Oct. 11, 2011) (suggesting that Congress intended that plaintiffs pay attorneys from their judgments and not recover "prevailing party" attorneys' fees under statute or common law). Accordingly, the Court **FURTHER ORDERS** that the full 25 percent shall be awarded to Plaintiffs' counsel in the amount of $375,000.00 or 25 percent of the $1,500,000.00 judgment.

**SO ORDERED** this 29th day of January, 2019.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**
